IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHERMAN MORISSETTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 19 C 4945 |
| ) | |
| WEXFORD HEALTH SOURCES, ) | |
| INC., GHALIAH OBAISI, as executor ) | |
| of the Estate of Saleh Obaisi, ) | |
| and ROZEL ELAZEGUI, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Sherman Morissette, who at the relevant time was imprisoned at the Illinois Department of Corrections' Stateville Correctional Center, has sued Wexford Health Sources, Inc. and two Wexford-employed physicians, alleging he was provided constitutionally deficient medical care. Morissette filed the lawsuit *pro se*, and the Court recruited counsel to represent him. The Court thanks recruited counsel Matthew C. Koch and Kyle M. Brennan of Marwedel, Minichello & Reeb, P.C. for their thorough and diligent representation of Morissette.

The defendants are Wexford; the executor of the estate of Dr. Saleh Obaisi; and Dr. Rozel Elazegui. They have moved for summary judgment. The facts are largely undisputed; what's argued are the inferences to be drawn from them and the sufficiency of the evidence.

Morissette was born in 1950. The relevant events largely took place in 2017-18, when he was 67/68 years old. Morissette had bad hips and started experiencing hip pain in 2012. By late 2017, there is evidence that he was in significant pain constantly, had trouble sleeping, and required crutches to walk. He was diagnosed by Dr. Yasser Farid, an orthopedic surgeon at University of Illinois Chicago Hospital, as having significant osteoarthritis in both hips and avascular necrosis of the right femur head. Morissette's claims in this case concern the defendants' treatment of his hip condition.

On December 21, 2017, Dr. Farid recommended right hip arthroplasty—hip replacement—to address Morissette's condition in that hip. But there was a hitch: Morissette had hepatitis C. This caused Dr. Farid concern about post-operative complications. As a result, Dr. Farid required treatment of Morissette's hepatitis C as a prerequisite to performing surgery.

At this point the hitch turned into a catch-22 of sorts. IDOC—not Wexford—had guidelines for treatment of imprisoned persons with hepatitis C. Under these guidelines, an inmate could get antiviral therapy for hepatitis C only if his AST to platelet ratio index (APRI) exceeded a certain level. Morissette's APRI score was below that level. In short, his hepatitis C was not considered severe enough by IDOC for treatment, but it was considered by Dr. Farid as too severe to allow hip surgery.

On December 21, 2017, the same day Morissette saw Dr. Farid, he also saw Dr. Obaisi, the medical director at Stateville. Dr. Obaisi's notes reflect he was aware of Dr. Farid's findings and recommendation—they contain a notation stating, in substance, "Dr. Fareed [sic] from UIC indicated surgery will be done if hepatitis C treated." Dr. Obaisi directed e-mailing Dr. Farid's report to Dr. Chuang at UIC Hospital; Dr. Chuang

2

was the hepatitis treatment provider there. There is no evidence that Dr. Obaisi did anything else at that point. Two days later, on December 23, 2017, Dr. Obaisi died.

Morissette's next medical visit was with a physician's assistant at Stateville on February 7, 2018. Morissette reported that he needed hepatitis C treatment so that he could have hip surgery. The PA scheduled Morissette to meet with Dr. Elazegui, who in February 2018 succeeded Dr. Obaisi as medical director.

Dr. Elazegui served as medical director for only about two months, from early February 2018 until sometime in April of that year. He saw Morissette only once, on February 13, 2018. During that visit, there was no discussion about Morissette's hip problems, the recommended hip surgery, or his hepatitis C. Specifically, Dr. Elazegui's notes do not include any reference to these matters, and Morissette does not contend that he brought up anything about his bad hip, the surgery recommendation, or his need for hepatitis treatment. Rather, the visit concerned issues relating to Morissette's eyes, including discussion of a recent consultation with an eye specialist. In short, there is no evidence indicating that Dr. Elazegui was ever made aware of Morissette's hip or hepatitis issues. It is certainly true that Dr. Elazegui would have seen plenty of references to both if he had looked through Morissette's medical records, but there is no evidence that Dr. Elazegui did this.

On May 29, 2018, Morissette met with Dr. Christian Okezie, who had succeeded Dr. Elazegui as medical director. Dr. Okezie is not named as a defendant in this case. Dr. Okezie noted that recent testing of Morissette had shown normal liver function. A few days later, on June 4, 2018, Morissette's APRI score was still below the level to qualify him for hepatitis C treatment under the IDOC guidelines. Dr. Okezie participated

in a Wexford "collegial review" discussion on June 5, and they determined to contact UIC to determine if Morissette's hip surgery could proceed given his normal liver function tests.

On July 12, 2018, UIC ordered blood tests as a precursor to performing hip replacement surgery. Wexford approved this on July 24, 2018, and on August 7, 2018 Wexford approved a right hip replacement for Morissette. Surgery was scheduled for October 10, 2018, and Morissette went to UIC on September 26 for a preoperative consultation. Testing showed normal liver function tests but a viral load of 3.014 million, which as best as the Court can tell is considered to be high. UIC cancelled the surgery.

A viral load test in mid-November 2018 showed a reduced, but still high viral load. Morissette did not get treatment for hepatitis until July 18, 2019. By August 2019 the virus was undetectable or virtually so, and Morissette completed treatment for hepatitis C in mid-October 2019.

Morissette was discharged from IDOC shortly after that, on November 19, 2019. After his release, he went to a local Veterans Administration hospital and from there was referred to Alexian Brothers Hospital regarding his hip. Morissette underwent right hip replacement surgery on June 25, 2020.

Morissette's claims against Dr. Obaisi, Dr. Elazegui, and Wexford involve the delay in performing hip replacement surgery, which a jury could find resulted from the failure to get Morissette into antiviral treatment for hepatitis C. His claims arise under the Eighth Amendment to the Constitution. To sustain a claim against Dr. Obaisi's estate or against Dr. Elazegui, Morrissette must show that that the particular defendant was deliberately indifferent to a serious medical need. *See, e.g., Holloway v. Delaware*

4

*Cnty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

The defendants contend that Morissette has failed to show that his hip condition amounted to a serious medical need. A reasonable jury could find this requirement satisfied. There is evidence that the condition "significantly affect[ed] [Morissette's] daily activities," which is sufficient. *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). Specifically, Morissette has testified that he suffered from serious pain more or less constantly, had trouble sleeping, and required crutches to walk.

Morissette's claims against Dr. Obaisi and Dr. Elazegui founder, however, on the requirement of deliberate indifference. A person in the physicians' position is deliberately indifferent if he knows there is a serious risk to an imprisoned person's health and consciously disregards the risk. *See, e.g., Holloway*, 700 F.3d at 1073. The defendant must know facts from which he could infer that a risk of harm exists, and he must actually draw that inference. *See, e.g., Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017). A factfinder may infer deliberate indifference when a risk from a particular course of treatment, or lack of treatment, is obvious. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). In this case the risk largely involves continued hip pain while surgery was delayed.

No reasonable jury could find that Dr. Obaisi was deliberately indifferent to Morissette's hip condition. Morissette focuses on the period after Dr. Farid recommended surgery, and appropriately so, as there is no evidence of indifference to Morissette's hip condition before that: among other things, Dr. Obaisi had approved referrals of Morissette to the UIC orthopedic clinic, including the referral that led to the

5

surgery recommendation.

Once Dr. Farid recommended surgery on December 21, 2017, Dr. Obaisi did nothing to prevent it. A key fact here is that Dr. Obaisi died just two days after that, on December 23 (which, the Court notes, was a Saturday). There is no evidence that there was anything Dr. Obaisi did anything within that brief moment in time to prevent or hinder Morissette from getting surgery, and no evidence that there was anything he could have done but failed to do within those two days.

Morissette contends that it was deliberately indifferent for Dr. Obaisi to "blindly follow" the IDOC hepatitis C treatment guidelines. There are at least two problems with this. First, they were *IDOC's* treatment guidelines, not Dr. Obaisi's. There is no evidence that would permit a finding that Dr. Obaisi had the ability to ignore or bypass IDOC's guidelines and order hepatitis C antiviral treatment outside the guidelines' parameters. That aside, and perhaps more importantly, there is no evidence that "blindly following" the IDOC guidelines is what Dr. Obaisi actually did. The evidence reflects that upon seeing Morissette when he returned from UIC on December 21, 2017, Dr. Obaisi caused Dr. Farid's report recommending surgery but requiring hepatitis treatment first to be forwarded to Dr. Chuang, the designated hepatitis treatment provider for IDOC inmates at UIC. It's hard to see that as anything other than the start of an effort to try to get Morissette the treatment that Dr. Farid required. It's certainly not an indication of deliberate indifference.

The main factor precluding Morissette's claim against Dr. Obaisi, however, is the question of timing. Even if one could plausibly contend that Dr. Obaisi was required to do more than send Dr. Farid's report to Dr. Chuang to see what could be done, two

6

days simply is not enough time to consider any "inaction" by Dr. Obaisi to amount to deliberate indifference—particularly when he died on the second of those two days. For these reasons, Dr. Obaisi's estate is entitled to summary judgment.

Next is Dr. Elazegui. There is no evidence that would permit a reasonable jury to find that he was even aware of Morissette's hip condition, which indicated earlier is a requirement for establishing deliberate indifference. It is undisputed that Dr. Elazegui saw Morissette only once during his brief tenure as Stateville medical director, and it is also undisputed that the visit concerned a different medical issue, not Morissette's hip condition. Indeed, the evidence is undisputed that Morissette himself did not bring up anything about his hip or hepatitis during his visit with Dr. Elazegui. It is true, as the Court has noted, that if Dr. Elazegui had reviewed Morissette's records on his own, he likely would have learned about the hip condition. But there is no evidence that Dr. Elazegui reviewed the records. Though one might argue this was careless, Morissette cites no caselaw, nor is the Court aware of any, that would indicate that Dr. Elazegui's failure to review those records gives rise to a claim of deliberate indifference—a much higher threshold than carelessness or even negligence. Dr. Elazegui is entitled to summary judgment.

The Court turns, finally, to Wexford. To sustain his claim against Wexford, Morissette must establish that it had an express policy or custom, or a widespread practice, that caused a deprivation of his constitutional rights. *See, e.g., Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). The policy identified by Morissette is one of two things, or both: the failure to adopt guidelines to address treatment of hepatitis C as a prerequisite for surgery needed for another serious

medical condition, *see* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 10, and/or "blindly applying the IDOC Hepatitis C Guidelines," *id.* at 11. The absence of a policy may suffice if Morissette can show this is a "situation[ ] where rules or regulations are required to remedy a potentially dangerous practice," *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009), or if Wexford had "actual or constructive knowledge that its agents [would] probably violate constitutional rights" but did nothing. *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012).

     The problem here is that Morissette has no evidence of any prior or contemporaneous incidents where someone else fell between the cracks the way he did. As a general rule the absence of other incidents is fatal to a policy-or-practice claim like the one Morissette asserts against Wexford. *See Dean*, 18 F.4th at 236. There are some situations when "the risk of unconstitutional consequences from a municipal policy 'could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations,'" *id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)), as well as situations in which "[a] single memo or decision showing that the choice not to act is deliberate could . . . be enough." *Id.* (quoting *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017)). But no reasonable jury could find this to be so in Morissette's case. The evidence is undisputed that Wexford didn't actually leave the gap open; it did not simply drop Morissette's case upon learning that he was outside the IDOC hepatitis treatment guidelines. Rather, Wexford's policy in this situation was to follow the "community standard of care," which the evidence indisputably shows it did by its efforts to qualify Morissette for hip surgery based on his largely stable liver function tests.

All of that aside, and finally, it would be incongruous, to say the least, to effectively hold *Wexford* responsible for arguable flaws in *IDOC's* policy. One way or another, however, no reasonable jury could find that any violation of Morissette's constitutional rights was caused by a policy—or a policy gap—on the part of Wexford.

## Conclusion

For the reasons stated above, the Court grants the defendants' motion for summary judgment [89] and directs the Clerk to enter judgment in favor of the defendants and against the plaintiff.

Date: February 17, 2023

_____
MATTHEW F. KENNELLY
United States District Judge